[Cite as *In re M.D.*, 2026-Ohio-1910.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: M.D.

C.A. No.     25CA012398

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     24JC68105

DECISION AND JOURNAL ENTRY

Dated: May 26, 2026

FLAGG LANZINGER, Presiding Judge.

{¶1}   Appellant, A.J. ("Mother"), appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that placed her minor child in the legal custody of a maternal aunt ("Aunt") and uncle ("Uncle").  This Court affirms.

I.

{¶2}   Mother is the biological mother of the child at issue in this appeal: M.D., born December 26, 2023.  M.D.'s father ("Father") did not appeal from the trial court's judgment.

{¶3}   M.D. is Mother's fifth child.  Before M.D. was born, Mother lost custody of her other children through separate cases in the Lorain County Juvenile Court because of concerns about Mother's long-term substance abuse, untreated bipolar disorder and anxiety, and domestic violence perpetrated against Mother by her intimate partner at the time.  The juvenile court adjudicated her three oldest children neglected and dependent and eventually placed them in the legal custody of their maternal grandmother.  The juvenile court later removed Mother's fourth

child and adjudicated the child abused, neglected, and dependent. The court ultimately terminated Mother's parental rights and placed her fourth child in the permanent custody of Lorain County Children Services Board ("LCCS").

{¶4} When Mother gave birth to M.D., she and the child both tested positive for fentanyl, morphine, and THC. M.D. was transferred to Akron Children's Hospital ("ACH"), where she received treatment for symptoms of drug withdrawal. During M.D.'s one-week stay at ACH, Mother and Father did not visit the child and hospital staff did not know how to contact them.

{¶5} On the day M.D. was due to be released from the hospital, LCCS filed a complaint to allege that she was an abused, neglected, and dependent child because of the same concerns in her older siblings' cases: Mother's ongoing substance abuse and untreated mental illnesses, domestic violence in Mother's relationship with Father, and the inability of the parents to provide appropriate care for M.D. or meet her other basic needs. The court removed M.D. and placed her in the emergency temporary custody of LCCS. The child was placed in the home of Aunt and Uncle, where she remained throughout this case.

{¶6} The trial court later adjudicated M.D. as an abused, neglected, and dependent child and placed her in the temporary custody of LCCS. In its dispositional order, the trial court also adopted the case plan as an order of the court. The case plan required Mother to engage in substance abuse, mental health, and domestic violence assessments and treatment; obtain and maintain stable income and housing; and otherwise demonstrate that she could meet the basic needs of the child. Mother complied with medically assisted substance abuse treatment and stopped using fentanyl approximately two months after this case began. However, she was not willing to follow the recommendations that she engage in counseling to modify her long-term substance abuse behavior and/or develop a sober support network.

{¶7}     Mother did not obtain a domestic violence assessment and did not engage in any treatment. She engaged in mental health counseling only sporadically and did not consistently take the psychiatric medication that she was prescribed to treat her bipolar disorder and anxiety. Mother also did not obtain stable income or housing and did not maintain consistent contact with LCCS or Aunt and Uncle.

{¶8}     Although Mother had a large extended family, she lacked a strong family support system. The caseworker explained that Mother had "burned a lot of bridges" with her family because of her long-term substance abuse and loss of four other children. Except for Aunt and Uncle, most of Mother's family members were no longer willing to offer her financial or emotional assistance.

{¶9}     Shortly before the one-year sunset date, LCCS moved for M.D. to be placed in the legal custody of Aunt and Uncle. Mother alternatively requested that the child be returned to her legal custody or that the court grant an extension of temporary custody to allow her more time to work on the case plan. Following a hearing before a magistrate, the trial court placed M.D. in the legal custody of Aunt and Uncle and denied Mother's alternative dispositional motions. Mother filed an objection to the magistrate's decision, which was overruled by the trial court.

{¶10}     The trial court placed M.D. in the legal custody of Aunt and Uncle and granted Mother and Father parenting time with the child. Mother appeals and raises two assignments of error, which this Court will address together because they are closely related.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION GRANTING LEGAL CUSTODY TO THE MATERNAL AUNT AND UNCLE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND RESULTED FROM A MISAPPLICATION OF LAW.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT'S DECISION TO ADOPT THE MAGISTRATE'S DECISION GRANTING LEGAL CUSTODY TO THE MATERNAL AUNT AND UNCLE WAS NOT IN THE BEST INTEREST OF THE CHILD.

{¶11} Mother's assignments of error address the merits of the trial court's decision to place M.D. in the legal custody of Aunt and Uncle. Mother begins by arguing that the trial court erred by basing the legal custody decision solely on the best interest of the child. She asserts that, before considering the child's best interest, the trial court was required to find that Mother was an unsuitable parent under the standard set forth in *In re Perales*, 52 Ohio St.2d. 89 (1977), syllabus. To begin with, Mother did not raise this argument in her objections to the magistrate's decision. Juv.R. 40(D)(3)(b)(iv) provides that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, . . . unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." Because Mother failed to preserve this argument by raising it in her objections, she has forfeited all but plain error on appeal.

{¶12} Mother has not articulated a plain error argument on appeal. Moreover, her argument lacks merit as a matter of law. The common law requirement that the trial court find a parent unsuitable before awarding legal custody to a nonparent applies only to private legal custody motions filed under R.C. 2151.23(A)(2) "involving presumptively fit parents and

nonparents." *In re T.W.*, 2003-Ohio-7185, ¶ 13 (9th Dist.). The *Perales* standard does not apply in this abuse, neglect, and dependency case.

{¶13} M.D. was adjudicated as an abused, neglected, and dependent child on February 15, 2024. That adjudication "implicitly involve[d] a determination of the unsuitability of the child's custodial and/or noncustodial parents." *In re C.R.*, 2006-Ohio-1191, paragraph two of the syllabus. It is well settled that, "[f]ollowing an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). No specific test or set of criteria is set forth by statute regarding an award of legal custody, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.).

{¶14} Mother also challenges the trial court's finding that legal custody to Aunt and Uncle was in M.D.'s best interest. She does not explain why legal custody to Aunt and Uncle was *not* in the child's best interest. Instead, her argument is that it was in the best interest of the child to be returned to her legal custody because she had complied with the reunification requirements of the case plan. This Court has repeatedly emphasized that case plan progress is not dispositive of the child's best interest. *See*, *e.g.*, *In re A.M.*, 2025-Ohio-5029, ¶ 22 (9th Dist.); *In re T.R.*, 2024-Ohio-3092, ¶ 24 (9th Dist.); *In re J.W.*, 2019-Ohio-210, ¶ 15 (9th Dist.).

{¶15} Moreover, the record does not support Mother's brief argument that she had made sufficient progress on the case plan. Although Mother was engaged in medically assisted drug treatment, she was not involved in counseling to address her long history of substance abuse. Mother had also failed to pursue regular counseling to address her mental health or history as a

victim of domestic violence and she did not consistently take her prescribed psychiatric medications. Mother lacked stable income and housing, and, by the time of the hearing, the caseworker had been unable to contact her for the past four months.

{¶16} To determine whether legal custody is in the best interest of a child, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.). Those factors include: the interaction and interrelationships of the child, the child's wishes and custodial history, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). The factor set forth in R.C. 2151.414(E)(11) applied in this case because Mother's parental rights to her fourth child were involuntarily terminated before M.D. was born.

{¶17} The juvenile court may also consider the best interest factors in R.C. 3109.04(F)(1). *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While many factors overlap with those set forth in R.C. 2151.414(D)(1), additional factors that are relevant in this case are the child's adjustment to home, school, and community; the mental and physical health of all parties involved; and the proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(d),(e),(f).

{¶18} An award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.).

> Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of a child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *Id.*

{¶19} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶20} Mother does not argue about the facts pertaining to the best interest factors, but the undisputed evidence supported the trial court's conclusion that legal custody to Aunt and Uncle was in M.D.'s best interest. Beginning with the child's interaction and interrelationship with others, M.D.'s interaction with Mother during this case was limited to weekly, supervised visits. Because of the distance between their homes, Aunt and Uncle arranged for Mother to meet them for the visits at a shopping mall located halfway between their homes. Mother often arrived late for scheduled visits or missed them altogether. According to Aunt, Mother missed more visits than she attended. Mother did not usually call Aunt or Uncle to warn them that she would be late or was not coming. When Mother did not timely arrive for a scheduled visit, Aunt would call her, but Mother often did not answer her phone. If Mother answered her phone and said that she was on her way, Aunt and Uncle would accommodate Mother by waiting for her to arrive, so Mother did not miss another weekly visit.

{¶21} On the other hand, M.D. resided in the home of Aunt and Uncle for most of her short life and her interaction with them was consistent and positive. M.D. was developmentally on track and apparently had no prolonged effects from her pre-natal exposure to drugs. The

caseworker testified about the "team effort" in the home of Aunt and Uncle, and explained that their adult children frequently helped them care for M.D. Aunt and Uncle had facilitated visitation with the parents and planned to continue to do so. Aunt testified at the hearing that she loves Mother (her niece) and is dedicated to ensuring that M.D. can maintain a relationship with her.

{¶22} M.D. was less than two years old at the time of the hearing and was too young to express her wishes about where she wanted to reside. The guardian ad litem spoke on the child's behalf and opined that legal custody to Aunt and Uncle was in her best interest. She explained Aunt and Uncle were meeting all the child's needs and that "this family is wonderful." She commended Aunt and Uncle and their family for "go[ing] above and beyond in [M.D.'s] care and in their efforts to incorporate mom and dad into [M.D.'s] life."

{¶23} M.D. had never resided in the custody of Mother. She was technically in Mother's legal custody prior to her release from ACH, but Mother never came to visit M.D. while she remained hospitalized. M.D. has spent almost all her life in the temporary custody of LCCS and needed a legally secure permanent placement. Aunt and Uncle were prepared to provide a stable permanent placement for M.D.

{¶24} Finally, the trial court was required to consider the significant fact that Mother previously had her parental rights involuntarily terminated to her fourth child and failed to present clear and convincing evidence that, despite that prior termination, she was then able to provide M.D. with a safe and stable home. *See* R.C. 2151.414(D)(1)(e); R.C. 2151.414(E)(11); *In re M.J.*, 2024-Ohio-1261, ¶ 16 (9th Dist.) (explaining that the statute now shifts the burden to the parent to present evidence to rebut the statutory presumption of parental unfitness because of the prior involuntary termination of her parental rights.). Mother failed to present any evidence at the hearing to rebut the presumption that she remained unfit to provide a safe and stable home for

M.D. Aside from participating in medically assisted drug treatment, Mother had failed to take any consistent steps to comply with the reunification requirements of the case plan. She had not engaged in any substance abuse or domestic violence counseling, engaged only sporadically in mental health treatment, and lacked stable income and housing. By the time of the hearing, she had not had contact with LCCS for four months.

{¶25} Given the undisputed evidence before the trial court, it did not lose its way by concluding that it was in M.D.'s best interest to be placed in the legal custody of Aunt and Uncle. Mother's assignments of error are overruled.

III.

{¶26} Mother's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

 

 

                                                  _____

                                                  JILL FLAGG LANZINGER
                                                  FOR THE COURT

 

 

HENSAL, J.
SUTTON, J.
CONCUR.

 

APPEARANCES:

MARC STOLARSKY, Attorney at Law, for Appellant.

ANTHONY CILLO, Prosecuting Attorney, and NICOLE BURNS DERTOUZOS, Assistant Prosecuting Attorney, for Appellee.

MICHAEL TOWNE, Attorney at Law, for Appellee.